Battistone *v.* Benedetti, Appellant.

Argued March 16, 1956. Before STERN, C. J., JONES, BELL, MUSMANNO and ARNOLD, JJ.

*John E. Costello* and *Andrew E. Sheridan,* with them *James McIntyre,* for appellants.

*George I. Bloom,* with him *Milton D. Rosenberg, John C. Rogers, Charles G. Sweet, Bloom, Bloom & Yard* and *Rogers & Sweet,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, April 25, 1956:

On November 10, 1950, at 3:30 in the morning, in Scenery Hill, Washington County, a night club building in the final processes of construction and not yet ready for occupancy was wrecked and completely destroyed by explosion and fire. The plaintiff-owner of the building attributed the cause of the explosion to

faulty installation of twin furnaces in the basement by the defendants, Rudy Benedetti and Ernest Reed, Donald M. Vidale, and J. W. Proie, and he accordingly brought suit in trespass against them.

The jury returned a verdict of $51,000 in favor of the plaintiff against all the defendants and a verdict of $3,500 in favor of Benedetti and Reed in their counterclaim against the plaintiff. All the defendants appealed and here ask for judgment n.o.v. or a new trial.

It was in September, 1950, that the defendants, Benedetti and Reed, trading as the Dependable Furnace Company, entered into an agreement with Battistone to install in his new building two Niagara Oil Furnaces, the furnaces to be obtained through J. W. Proie, trading as Air Tron Company, distributors for the Niagara Company. Donald M. Vidale, engineer for Air Tron, was present at the time of the discussion between Battistone and the partners, Benedetti and Reed. Battistone testified that Vidale agreed ". . . on what kind of system would be the best up there and it would need two furnaces and it would cost $5,100; that is including all the work and that he would see, that he would supervise the job and see everything was done right and that the Air-Tron was the distributing company for the Niagara Company in Cleveland."

Benedetti and Reed began the work of installation about October 15, 1950 and completed it on November 9, 1950. Vidale was present and participated in the work on three different days. He was present also on the night of November 9th when the furnaces were lighted for the first time. As the apparatus warmed up, it gave off fumes and hissing noises which caused Frank Agotti (the general contractor) to exclaim: "What are you trying to do, blow us up?" Vidale replied: "Don't worry, everything will be all right." Both Battistone and Agotti then said to Vidale that

if the furnaces were to operate all night, an attendant should be on duty to watch over them and the building. To this, Vidale replied: "You don't have to worry about nothing . . . those automatics will take care of it." Everyone departed about 10 p.m., and at 3:30 the next morning the building blasted apart in an explosion which twisted girders, sheared off a chimney, hurled bricks and a window frame 150 feet and catapulted at least one concrete block a distance of 75 feet. When the force of the explosion and ensuing fire had spent itself the building was a wreck and total loss.

Since no human eye witnessed the precise agency which wrought the building's doom, the plaintiff, in charging the defendants with responsibility for his losses, resorted to circumstantial and expert evidence to reconstruct the story of the disaster. It was shown that the 2,000-gallon tank in the yard, which fed the twin furnaces with oil, discharged 325 gallons in nine hours (the expired time between the lighting of the furnaces and the explosion), whereas the normal consumption for that period would not have surpassed an expenditure of 27 gallons. An investigation made the day after the explosion showed that the oil pump and the door of the right hand furnace (the left hand furnace was not damaged) had been blown from the furnace to the opposite wall of the furnace room. Battistone, Frank Agotti, Jr., (son of the general contractor), and Russell Smiley, carpenter, all testified that the copper tubing which carried the oil from the outside tank into the furnaces was not provided with check valves. The absence of this device was regarded by Alex Kalinsky, mechanical engineer and heating expert, as of extreme significance. When he was asked: "Primarily, then, what was the cause of the explosion and the resulting fire?" he replied: "Lack of check

valves in the supply line." He testified also: "Assuming what you have told me and from my examination of the premises, the electrodes, as I have brought up before, there occurred a violent explosion in the furnace and on the right due to the oil pump not having a sufficient supply of oil spraying into the combustion chamber a mixture of oil and air that did not immediately touch the electrode points." He explained that it was his opinion that the supply and oil lines suffered a rupture which caused oil to flow to the floor of the furnace room, that the volatile part of the oil evaporated, causing an oil-air mixture which permeated the furnace room and spread into other parts of the building, and that when the thermostat called for heat it set off a spark which ignited the oil-air mixture, precipitating the explosion.

In their brief on this appeal, counsel for the defendants maintain that the three expert witnesses called by them demonstrated that the furnaces were in no way connected with the explosion. But to arrive at this conclusion, they must repudiate the testimony of the obviously unpartisan witness, the Deputy Fire Marshal, W. J. Heur, who inspected the ruins of the Battistone building only three hours after the explosion. Mr. Heur, who was under the jurisdiction of the State Police, declared that his investigation revealed to him that the explosion occurred in the furnace room. It is impossible to read the 450-page printed record of this case and come to any conclusion other than that the furnaces were the focal point of the devastating blast. To argue otherwise would be to argue that there was no explosion at all.

Although the defendants insist that the furnaces were innocent of any blame in the whole hapless event, they fail to offer any explanation as to how the explosion could otherwise have occurred. None of the de-

fendants' witnesses, including the three experts, attempted to present any solution of the enigma as to how an uninhabitated structure of brick, stone and steel could disintegrate so completely if the patent explanation of the furnace defection is to be ruled out. It is true that the defendant in a trespass action has no affirmative burden to show what forces brought about the fortuitous occurrence for which the plaintiff seeks to hold him liable. However, when the plaintiff presents evidence which if believed fastens upon the defendant the imputation of negligence, the defendant may not complain if the jury eventually concludes that the defendant failed to shake off the imputation with equally credible evidence or at least failed to advance a theory of explanation which would melt the links in the chain of the prima facie case and reduce it to innocuous irrelevancy.

The plaintiff here not only, with circumstantial and expert evidence, forged a durable chain of convincing proof against the defendants. He went further and eliminated all other feasible explanations for the conflagration. Evidence was produced to show that the building was empty of combustibles and potentially explosive materials. It contained no gasoline, paint, turpentine or gas lines; there were no gas connections or gas lines in the immediate neighborhood. When, in the reconstruction of a scientific phenomenon, every possible explanation for the accepted result is ruled out but one, it is idle to argue that there could possibly be another explanation which lies in the realm of the unknowable and unascertainable and then expect a jury to base its verdict on that mysterious something which exists only in the misty shadowlands of shrouded mystery and supernatural supposition.

The defendants complain that the jury disregarded testimony presented by them, but in the very nature of things the jury cannot accept both the plaintiff's and the defendants' versions of a disputed fact. Where there is a conflict in the testimony between opposing parties, it is the function and the duty of the jury to determine which of the contradicting statements is the more credible,—in the absence of a possible reconciliation of the controverting evidence. For instance, the defendants point out that Vidale disputed the plaintiff's testimony of the non-existence of check valves; they argue that although Battistone said there was no drain directly in front of the furnaces they showed that there were sewer outlets which would have accommodated any excess of oil on the floor. But these and other conflicts in the testimony were questions of fact for the jury to decide. In the case of *Rauch v. Smedley,* 208 Pa. 175, 176, this Court said: "Where the testimony offered by the plaintiff makes out a prima facie case by showing the existence of facts from which an inference of negligence arises, the case is necessarily for the jury, notwithstanding that the great preponderance of the testimony is with the defendant. An inference of negligence having once arisen remains until overcome by countervailing proof, and whether it is so overcome is a question for the jury." The evidence presented by the defendants in this case did not go as far as that which appeared in the *Rauch* case because it cannot be said here that "the great preponderance of the testimony is with the defendant."

The defendants complain that some of the assertions in the hypothetical question put to the expert witness Kalinsky were contradicted by testimony presented by the defendants. A hypothetical question rarely encompasses the assertions of both the proposing and the opposing parties. The scope of a hypo-

thetical question was excellently described by Justice MESTREZAT in the case of *Gillman v. Media*, 224 Pa. 267, 274, where he said: "As, however, it is the province of the jury to determine the facts, an expert cannot be asked his opinion upon the whole evidence in the case where that is conflicting. But a party may state specifically the particular facts he believes to be shown by evidence or such facts as the jury would be warranted in finding from the evidence, and ask the opinion of the expert on such facts, assuming them to be true. The other side may likewise put a hypothetical question based upon such facts as he alleges are shown by the evidence or the jury would be justified in finding from the evidence. Neither side is required in putting the hypothetical question to include therein any other facts than those which he may reasonably deem established by the evidence."

It is urged in behalf of the defendant J. W. Proie that Donald Vidale was not his agent and that he was therefore incapable of binding him in any obligation to Battistone. We have seen that there was evidence that Vidale announced himself as engineer for Air Tron, that he participated in discussions leading up to the agreement with Battistone, that he declared he could supervise the installation of the furnaces to be obtained from Air Tron, that he actually worked on the installation and was present when the job was completed. It is to be noted also that the defendant Benedetti testified that at the beginning of the negotiations with Battistone, he (Benedetti) called Air Tron and that Air Tron sent Vidale to represent the concern. It was a question for the jury from all the evidence in the case whether Proie was proved to be Vidale's principal. In *Moon v. Matthews*, 227 Pa. 488, 493, this Court said: "The test is, whether the act was done in the prosecution of the business in which the servant

was employed to assist. If it was, the master is responsible." We are satisfied that this test was successfully met by the plaintiff's proof and that the jury's verdict holding Proie equally responsible with the other defendants was justified by the evidence.

The defendants request that this Court order a new trial in the event it should refuse judgment n.o.v. But the arguments adduced in favor of a new trial are no more convincing than those presented in behalf of judgment n.o.v. Specifically the defendants ask for a new trial on the proposition that the verdict was against the weight of the evidence. Only a most unusual situation, which assuredly *is* not present here, warrants the granting of a new trial on such a ground. (*Joseph v. Rochester Motor Coach Co.*, 380 Pa. 189). In urging a new trial the defendants repeat much of what was said in behalf of a reversal of the verdict. We do not find that those arguments would justify the awarding of a new trial any more than they would warrant the entering of judgment n.o.v.

Judgment affirmed.

Mr. Justice Jones and Mr. Justice Bell dissent as to the defendant Proie and would enter judgment n.o.v. as to him.