387 A.2d 480

Lucy GRUBB, Appellee,

v.

ALBERT EINSTEIN MEDICAL CENTER, Appellant in No. 1059, Appellee in Nos. 1094 and 1100,

Mark Kauffman, M.D., Appellant in No. 1064, Appellee in Nos. 1059, 1094 and 1100.

Martin BELLER, M.D. and Irvin Stein, M.D., Individually and as co-partners, Appellants in No. 1094, Appellees in Nos. 1059 and 1100,

v.

STRYKER CORPORATION, Appellant in No. 1100, Appellee in Nos. 1059, 1064 and 1094.

Superior Court of Pennsylvania.

Argued Sept. 20, 1976.

Decided April 13, 1978.

384

James Lewis Griffith, Philadelphia, for appellant at No. 1059.

Francis E. Shields, Philadelphia, for appellant at No. 1064.

James J. McCabe, Jr., Philadelphia, for appellants at No. 1094.

Patrick W. Kittredge, Philadelphia, for appellant at No. 1100.

Jerome H. Ellis, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PER CURIAM:

These are appeals from the verdict entered in favor of the plaintiff-appellee, LUCY GRUBB, by ALBERT EINSTEIN MEDICAL CENTER, appellant in No. 1059, Appellee in 1094 and 1100; MARK KAUFFMAN, M.D., appellant in No. 1064, Appellee in Nos. 1059, 1094 and 1100; MARTIN BEL-LER, M.D. and IRVIN STEIN, M.D., Individually and as Co-Partners, Appellants in No. 1094, Appellees in Nos. 1059 and 1100; and STRYKER CORPORATION, additional defendant, appellant in No. 1100, Appellee in Nos. 1059, 1064 and 1094.

On November 19, 1964, the plaintiff, Lucy Grubb, underwent surgery to relieve pain and discomfort she suffered as a result of a herniated cervical disc condition. As a result of a mishap during surgery, she was rendered quadriplegic, suffering weakness of the muscles in all four limbs.

The symptoms Mrs. Grubb complained of prior to surgery appeared after she bumped her head while bending to reach a low cabinet in her home. After consultation with her own physician she was referred to Dr. Irving Stein, a board certified orthopedic surgeon who was then Chief of Orthopedic Surgery at Albert Einstein Medical Center.

Mrs. Grubb was admitted to the hospital as a ward patient "on the service of" Dr. Stein and was given conservative treatment including traction and the administration of codeine. Since this course of treatment failed to produce the

desired relief, Dr. Stein recommended surgery. He informed Mrs. Grubb that without surgery she would never get symptomatic relief and a permanent curvature could result.

The operation planned is known as an anterior cervical fusion and procedurally includes the removal of a bone plug from the vertebrae at the C 5–6 interspace by means of a surgical tool and replacing it with a donor plug contemporaneously removed from the patient's hip.

Mrs. Grubb's complaint in trespass avers that she had not given her informed consent to the operation because she had been advised that the procedure was minor in nature and, further, that she was not appraised of the risk of harm to her spine. Indeed, the record shows that she had previously feared spinal injury in refusing a spinal tap. Nonetheless, Dr. Stein advised his patient that the surgery would be performed by Dr. Mark Kauffman, a third-year resident orthopedic surgeon at the time. Dr. Stein assured Mrs. Grubb that he would be present at the operation. Contrary to this representation Dr. Stein's partner, Dr. Martin Beller, was present in his place. Dr. Beller had the same certification as his partner, and both were charged with the duty of supervising Dr. Kauffman and generally monitoring his progress as a surgical resident. Although Dr. Beller was in attendance at the surgery in question he was not "scrubbed in" and therefore could not directly approach the operative site nor participate in the use of the sterilized equipment. However, according to the established staff-resident relationship at Albert Einstein, Dr. Beller had the right to direct Dr. Kauffman in his performance and could even have cancelled or terminated the procedure at any time.

On the morning of the operation Mrs. Grubb was placed under general anesthesia and a discogram was performed. This is a method of X-raying a disc after certain traceable dyes are injected into the neck area. The discogram confirmed the herniated disc diagnosis and the operation was commenced by Dr. Kauffman with Dr. Beller in attendance as explained above.

Dr. Kauffman used a number four Stryker plug cutter to remove the plug of bone from the vertebrae. This instrument is an electrically powered drill weighing between three and four pounds. The tool consists of four key parts; a serrated cutting edge; a sliding shield, a hexagonal fixation screw and a plunger used to remove the bone plug. The surgeon measures the depth to which he desires to drill and adjusts the shield accordingly, thereafter securing the shield (variously termed a guard, sleeve, guide or depth gauge at trial) by tightening the fixation screw with an allen-type wrench which is supplied by the manufacturer.

Procedurally, Dr. Kauffman made an incision in plaintiff's neck and the neck muscles were held back by tractors. The cervical spine at the location where the plug was to be inserted is 2.5 cm. thick. The hole where the plug was to be placed is drilled only to a depth of 1.0 cm., as in the donor plug. Dr. Kauffman testified that he measured the plug cutter to 1.0 cm. and tightened the hexagonal screw allowing for a 1.5 cm. margin between the cut and the spinal cord. The entire drilling procedure for a 1.0 cm. plug is normally completed in a few seconds and in the instant operation Dr. Kauffman noticed that the drill was cutting quite quickly which he attributed to the sharpness of the new drill. Dr. Kauffman stated in his post-operative report and likewise testified that in spite of his tightening the screw, securing the guard, the guard slipped allowing the drill to penetrate farther than he had expected. When he removed the drill he found that it had taken a full depth of vertebrae tissue and penetrated to the postinor cortex. Anticipating spinal shock Dr. Kauffman and his assistants inspected the spinal cord and posterior longitudinal ligament for bleeding. Upon finding no bleeding, Dr. Beller directed them to insert the donor plug and complete the operation.

In the post-operative recovery room Dr. Kauffman administered a lumbar spinal tap which showed no bleeding within the spinal column. A Queckenstedt test also showed that the fluid pressure within the spinal column was normal. From the foregoing test results Dr. Kauffman concluded

that the plaintiff suffered from spinal shock. Next Dr. Kauffman requested and received the consultation of Dr. Harold Haft, an experienced neurosurgeon, who found that the plaintiff was quadriplegic with paralysis at the C6 and C7 level. Both Drs. Kauffman and Beller agreed with this diagnosis.

Dr. Kauffman testified that he examined the Stryker plug cutter after the operation and opined that the guard had slipped. He also observed a scratch on the shaft of the cutter where the screw had not held but rather had slid along the shaft producing the scratch. In the immediate post-operative period, this scratch evidencing an alleged defective condition on the Stryker tool was observed by all of the physicians in attendance and by Dr. Jose Auday who was scheduled to perform surgery on another patient later that morning.

In 1966 Mrs. Grubb brought suit against Drs. Kauffman, Beller and Stein and against Albert Enstein Medical Center, a corporation. Drs. Beller and Stein were sued individually and as co-partners. Subsequently, Albert Einstein Medical Center joined the Stryker Corporation, the manufacturer of the plug cutter, as an additional defendant. After five weeks of trial, the jury returned a $450,000.00 verdict in favor of the plaintiff against all of the defendants.

Each defendant filed motions for a new trial, for judgment n. o. v., and to mold the verdict in his favor. A court en banc dismissed all of these motions without opinion with two judges concurring.

As the reviewing court we are bound by well defined parameters of examining the record certified to us. First, in an appeal from the denial of a motion for a judgment n. o. v., the evidence must be viewed in a light most favorable to the verdict winner. Evidence supporting the verdict is considered and the rest is rejected. All conflicts in testimony are resolved in favor of the verdict winner, the plaintiff herein. *Rutter v. Morris,* 212 Pa.Super. 466, 243 A.2d 140, 141 (1968). In considering the motion for

a new trial for the reasons asserted by the appellants we will reluctantly interfere with the reasoning of the lower court and the verdict only upon a clear showing of a mistake of law or abuse of discretion. *Simmons v. Mullen,* 231 Pa.Super. 199, 331 A.2d 892 (1975); *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 285 A.2d 451 (1972); *Collins v. Hand,* 431 Pa. 378, 246 A.2d 398 (1968). In order to succinctly review the appeal issues we will consider the case against each defendant.

## I. *Liability of Dr. Kauffman*

Considerable appellate case law has dealt with the standard of care required of a physician. In the absence of a special contract the treating physician is neither a warrantor nor a cure nor the guarantor of the result of his treatment. The plaintiff in a malpractice action must prove either that (1) the physician did not possess and employ the required skill and knowledge, or (2) that he did not exercise the care and judgment of a reasonable man in like cases *and* that the injury complained of either (1) resulted from the failure on the part of the physician to possess and employ the required skill and knowledge, or (2) resulted from his failure to exercise the care and judgment of a reasonable man in like circumstances. *Collins v. Hand,* supra; *Donaldson v. Maffucci,* 397 Pa. 548, 156 A.2d 835 (1959).

The plaintiff asserted four separate theories of negligence against Dr. Kauffman: (1) he failed to set the plug cutter accurately; (2) he failed to take proper measurements from Mrs. Grubb's X-rays in order to get an exact setting for the plug cutter; (3) he failed to tighten the set screw sufficiently so that the plug cutter could not slip; and (4) he failed to closely observe the plug cutter during the operation so as to be able to remove it from the neck of the plaintiff in time to avoid injury.

In consideration of the first assertion Dr. Kauffman testified at trial that there was no possibility that he had erred in setting the instrument. The Doctor testified as follows:

"Q. It is not possible the only way it could have happened was that you didn't set it properly? That is not a possibility?

"A. That is not a possibility, no. That is asking me to make an error in a judgment of depth far greater than is reasonably possible."

However, Dr. Kauffman's recollection of how he measured the instrument is less than clear. At a deposition taken earlier in the case, Dr. Kauffman did not or could not recall how he measured the 1 cm. adjustment. And upon cross-examination this inconsistency was projected for the jury's consideration. Clearly there was a substantive question of not only how the plug cutter was set but also of the accuracy of the setting to warrant the jury to conclude Dr. Kauffman's negligence and that such negligence was the proximate cause of the plaintiff's injury.

The plaintiff's second theory against Dr. Kauffman asserts that he failed to take proper measurements from her X-rays to obtain an exact setting of the plug cutter. Interestingly enough this theory is based upon the testimony of Dr. Beller in another trial. Since there is an admission that Dr. Kauffman did not take a measurement from the life-size X-ray, the question then becomes, should he have done so? Dr. Kauffman testified that the surgical procedure does not require such a measurement and Dr. Beller concurred with this assertion in his testimony. However, a prior inconsistent statement by Dr. Beller in a previous case put the lack of measurement from the X-ray at issue. In cross-examination the following prior testimony was read to Dr. Beller:

"Q. All right. Now, after that test had been concluded tell the court what was your next operative step?

A. The next step is to remove the intervertebral disc at each of these two spaces.

Q. What instrument is used to remove them?

A. The instrument which we term is called a plug cutter. It is an instrument in which we core. . . Now one of the important problems is that it is not willy nilly carpentry. In other words, it would be lovely

to core all the way back and take it out in one piece and then go home, but actually, the spinal cord is back there. So you can't come through. You cannot come through the back.

Q. Well, how do you know when to stop? How do you know that this anatomy is going to be consistent with what you expect it to be?

A. From X-ray. In other words, the cutter is carefully placed upon a control X-ray film before the procedure is done and the depth of the cutter with the shoulder is measured so that you don't go back too far. Having done this, though, you have essentially made—you have gotten the cork out of the bottle. . . . "

Suffice to say that Dr. Beller was less than clear in attempting to rectify the inconsistency in testimony. Consequently, in light of Dr. Kauffman's failure to take measurements from the life-size X-ray of the plaintiff, the jury had before it enough evidence to conclude that Dr. Kauffman failed to employ the skill and knowledge of an orthopedic surgeon practicing in Philadelphia.

 The third theory dealing with Dr. Kauffman's failure to tighten the screw was presented through the expert testimony of Dr. Robert Groff, an experienced neurosurgeon. Appellants have vigorously argued the qualifications of Dr. Groff and the admission of his testimony. However, the admission of expert testimony is within the sound discretion of the trial court and will be reversed only for a clear case of error. *Flavin v. Aldrich*, 213 Pa.Super. 420, 250 A.2d 185 (1968).

When Dr. Groff testified defense counsel repeatedly objected to plaintiff's questions on the ground that the questions were based on facts not in evidence, i. e., that the screw had not been tightened sufficiently. After sustaining the first objection and holding a side-bar discussion, the court below allowed the following:

"Q. Assuming, sir, that during this operation the plug cutter slipped and there followed an injury to the

spinal cord, as I have described before, do you have an opinion with reasonable medical certainty as to what caused the plug cutter to slip?

A. Yes."

Counsel for Dr. Kauffman again objected and stipulated that the plug cutter had slipped causing the damage to the plaintiff. The objection was properly overruled and Dr. Groff concluded that in his opinion the screw was not properly tightened.

As the lower court observed in its opinion, citing *Barri-stone v. Benedetti*, 385 Pa. 163, 122 A.2d 536 (1956):

"The defendants complain that some of the assertions in the hypothetical question put to the expert witness Kalinsky were contradicted by testimony presented by the defendants. A hypothetical question rarely encompasses the assertions of both the proposing and opposing parties."

Furthermore, the testimony of Dr. Groff did not conclude that the screw was not tightened at all, but rather that it was not tightened properly. The self-serving declaration by Dr. Kauffman that he had tightened the screw twice and his stipulation of its subsequent slipping only reinforces the conclusion that he had tightened it improperly, or so the jury could have concluded.

The final theory of the plaintiff against Dr. Kauffman alleges that he failed to make proper observation of the plug cutter during the operation and failed to remove it in time. The testimony of Dr. Kauffman indicates that he examined the plug cutter and set the screw. While drilling he noticed that the procedure was taking longer than usual. Dr. Groff asserted that the proper procedure was to start-stop and retighten the screw and Dr. Kauffman admittedly did not check the screw after the initial tightening, although he was informed that the plug cutter was new. Such a factual setting understandably requires close observation. However, Dr. Kauffman testified as follows:

"Q. Let me just say you are using different words, and I want to make sure you and I understand each other. Grammatically, you now say you noticed the guard

to be at the depth of the body rather than when it reached the body? In other words, when you first saw it, it was already at the body; that is what you are telling me?

A. Yes.

Q. You did not see it reach the body?

A. No."

A close reading of the record clearly shows that there was more than sufficient evidence to warrant the fact finder to conclude Dr. Kauffman's negligence, in any one or all of the theories presented, was the proximate cause of the plaintiff's injury.

## II. Liability of Dr. Beller, Dr. Stein and Albert Einstein Medical Center

The Captain of the Ship Doctrine was originally set forth in *McConnell v. Williams*, 361 Pa. 355, 65 A.2d 243 (1949) and has agency considerations as its base. The essential question is whether one is subject to the control of another not only to the work to be done but also the manner of performing it. Furthermore, it has been consistently held that a physician may be simultaneously the agent of a hospital and another physician although the employment is not joint. *Yorston v. Pennell*, 397 Pa. 28, 153 A.2d 255 (1959). However, the master must have control not only over the agent but over the work and the performance thereof before liability can be extended to him. *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). And the determination of whether a resident was the servant of a senior surgeon is a factual issue to be determined by the trier of fact. *Thomas v. Hutchinson*, 442 Pa. 118, 275 A.2d 23 (1971).

In instructing the jury the trial court gave the following general agency charge:

"In determining the question of agency, you must consider a number of factors—whose work was being done, who had the right to control the work and the manner of doing it, who received the benefit, and had the right to receive the benefits from the performance of the work. It

seems from the evidence in this case that Dr. Kauffman was the agent of someone at the time of the surgery, but I leave it to you to decide that issue. Determine whose work was being done and who had the right to direct and control."

Considering this passage and the charge as a whole we find it proper.

In the performance of this operation on the plaintiff, Dr. Kauffman was in a myriad of relationships with respect to appellants Beller, Stein and Albert Einstein Medical Center. Drs. Stein and Beller in turn interlaced variously with each other and Albert Einstein Medical Center. Dr. Stein and Dr. Beller were members of a partnership with the attendant personal liabilities of that relationship, *inter se.*

In November of 1964, Dr. Stein was the Chief Surgeon of the Department of Orthopedic Surgery at Albert Einstein Medical Center, and was in charge of the training and supervision of all orthopedic residents, including Dr. Kauffman. He had the right and obligation to assign the various orthopedic staff members to supervise surgery by the residents which obligation he exercised in assigning his partner to Dr. Kauffman. The ultimate responsibility for Dr. Kauffman's training reposed in Dr. Stein who had the right to renew Kauffman's yearly contract.

In order to admit patients to Albert Einstein Medical Center, Dr. Beller assumed the general responsibility of teaching resident surgeons, including Dr. Kauffman. More specifically Dr. Beller had the right to:

(a) cancel the surgery;

(b) dictate the procedure or method of surgery;

(c) define the scope of surgery;

(d) permit Dr. Kauffman to do the surgery or to stop Dr. Kauffman at any point or to do the entire surgery or any portion thereof himself;

(e) correct any act or omission on the part of any member of the surgical team;

(f) exercise full, complete and final authority over the operation or post-operative treatment of the patient.

The fact that Dr. Beller was not scrubbed for the surgery did not minimize his authority or the agency relationship he had with Dr. Kauffman.

In November of 1964 Dr. Kauffman was a third-year resident in orthopedic surgery being at the senior resident level within the Albert Einstein Medical Center orthopedic program. For his employment he was paid a salary by Albert Einstein Medical Center which was included in the daily charge to the patient. As a resident he had no right to directly charge a patient for his services.

■ As the lower court ably pointed out, if control is the crucial issue, it is abundantly clear that Dr. Beller possessed the requisite control over Dr. Kauffman, as a borrowed servant. *Collins v. Hand,* supra. Furthermore, Dr. Stein is liable in damages to Mrs. Grubb as a result of the partnership with Dr. Beller. Each member of a partnership is liable for a tort committed by a co-partner acting within the scope of the partnership's business. *Baxter v. Wunder,* 89 Pa.Super. 585 (1926). When the plaintiff first came into the hospital she was presented to Dr. Stein by Dr. Kauffman. And, as mentioned previously, she was told that Dr. Stein would be present at and during the surgery. In fact Dr. Beller was in attendance in his place.

■ The jury also found against the Medical Center, a corporation, both as a negligent tort feasor and as a supplier of a defective surgical instrument. The latter issue will be discussed below. Since hospitals no longer have the benefit of charitable immunity the ordinary rules of agency apply to those institutions. *Flagiello v. Penna Hospital,* 417 Pa. 486, 208 A.2d 193 (1965). In *Tonsic v. Wagner,* 458 Pa. 246, 329 A.2d 497 (1974), the court considered whether both a hospital and the attending surgeon could both be liable in tort. In concluding in the affirmative the court stated at 458 Pa. 253, 329 A.2d 501:

"We conclude that agency law principles applicable to others should also apply to hospitals and operating surgeons. Hospitals, as well as operating surgeons, owe a

duty to the patient. If that duty is breached under circumstances from which a jury could reasonably conclude that the negligent party was at the same time the servant of two masters, both masters may be liable."

We, therefore, hold that there is sufficient evidence to permit the jury to assign liability against Drs. Stein and Beller and the Albert Einstein Medical Center. We further find no abuse of discretion in admitting Dr. Groff's testimony and the charge as a whole properly included the agency requirements.

### III. Strict Liability of Albert Einstein Medical Center and Stryker

The Supreme Court of Pennsylvania adopted § 402A of the Restatement of Torts (2d) as the law in this Commonwealth in the case of *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). That section of the Restatement reflects the modern trend of the law and imposes strict liability in tort on any person who sells a product in a defective condition unreasonably dangerous to the user or consumer if (1) the seller is engaged in the business of selling the product, and (2) the product reaches the user without substantial change in its condition. Although Mrs. Grubb was not the purchaser of the plug cutter, she was an ultimate consumer and therefore had a cause of action against the manufacturer. *Oehler v. Davis*, 223 Pa.Super. 333, 298 A.2d 895 (1973).

The plaintiff in this action, however, did not assert in her complaint a strict liability theory against Stryker. Nonetheless, she had the benefit of the allegations which the original defendant, Albert Einstein Medical Center, made in its third party complaint against Stryker. Since the alleged liability of Stryker is related to the claim originally made, the plaintiff enjoyed the benefit of the evidence presented by Dr. Kauffman who sought to avoid liability by shifting the entire responsibility to Stryker for a defective plug cutter.

In its post-trial motions and on appeal Stryker asserts several grounds for the relief claimed all of which we will consider serially.

First, counsel for Stryker alleges that there was no evidence that Stryker manufactured the plug cutter which injured Mrs. Grubb. This conclusion we find without merit for several reasons. Initially, we note that plaintiff's expert witness identified the instrument in question as a "Stryker drill, plug cutter." On cross-examination by Stryker's counsel, Dr. Groff again identified it as a Stryker instrument. Finally, we note as the trial court did in its opinion the following colloquy between Stryker's counsel and Dr. Kauffman:

"Q. Well, let's break it down, Doctor, into literature from the manufacturer of the bone plug cutter. Did you ever read any of their literature?

A. No sir.

Q. Nothing from Stryker?

A. No, sir."

From the foregoing there arose a rebuttable presumption that Stryker Corporation manufactured the bone cutter in question. *Sefton v. Valley Dairy Co.*, 345 Pa. 324, 28 A.2d 313 (1942). Which presumption Stryker failed to overcome and it now relies upon a sterile reading of the record which we refuse to do.

Stryker next alleges that the two year statute of limitations for personal injuries is a bar to the action against it. The operation on Mrs. Grubb took place on November 19, 1964. Suit was instituted against Albert Einstein Medical Center and the physicians on October 4, 1966. Stryker was joined by writ on December 2, 1966 or thirteen days after the second anniversary of the injury. We find no evidence in the record to indicate that Mrs. Grubb was in a position on December 2, 1964, while still a paralyzed patient at Albert Einstein Medical Center to determine the causal relationship between her injuries and the Stryker plug cutter. A distillation of the Pennsylvania rule was set forth in *Carney v. Barnett*, 278 F.Supp. 572 (E.D.Pa.1967):

". . . The statute begins to run as of the date of the injuries unless, in the exercise of reasonable diligence, the plaintiff could not have ascertained defendant's culpabili-

ty in the statutory period. When that culpability could not reasonably have been so ascertained, the statute begins to run as of the date it could reasonably have been discovered."

It was not until November 22, 1966 that the plaintiff was able to depose Dr. Stein and review the post-operative memorandum. On December 2, 1966 Stryker was joined at a time clearly within the statutory period.

■ Next Stryker urges that there was insufficient evidence of the cutter being defective and that such defects caused the injuries to the plaintiff. Stryker also objected to the introduction of a later Stryker bone plug drill, and we will consider these objections jointly.

Mr. Fred Kluger, a bio-medical engineer, was called to testify on behalf of Dr. Kauffman. He examined the tool used on the plaintiff and discovered that the bottom portion of the setting screw was not flat. This is significant since maximum contact by the screw with the barrel of the drill is necessary to fix it securely. Furthermore, we are faced with the voluminous testimony of Dr. Kauffman that he was presented the new instrument and secured the screw twice. Furthermore, a more recent model of the Stryker bone drill was offered to Mr. Kluger for his examination. This model was given to him for his examination not to improperly show that the tort feasor had taken remedial measures but rather to support Kluger's opinion that the serrated teeth on the later model would and indeed did afford maximum contact, and, most importantly, that a set screw with serrations was available to the manufacturer in 1964.

■ Finally, we have reviewed the charge to the jury on proximate causation and are convinced that it sufficiently covers the last issue of Stryker who requested a charge of intervening and superseding causation. To have required a more detailed instruction could only have obfuscated the causation issue. Contrary to the position taken by Stryker, an independent act of negligence by a second tort feasor will not necessarily relieve the first wrong-doer of liability.

*Thornton v. Weaber*, 380 Pa. 590, 112 A.2d 344 (1955); *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977).

In reviewing the strict liability of Albert Einstein Medical Center we are considering a case of first impression in Pennsylvania. However, the Supreme Court of Pennsylvania has given a wide berth to Section 402A and has found that liability extends to all sellers in the distributive chain. *Bialick v. Pittsburgh Brewing Company*, 430 Pa. 176, 242 A.2d 231 (1968). The court has further recognized that liability does not turn on the technical existence of a sale. *Hoffman v. Misericordia Hospital*, 439 Pa. 501, 267 A.2d 867 (1970).

At least one court has held the view that mechanical and administrative services provided by hospitals should not necessarily be exempt from strict liability. In *Johnson v. Sears, Roebuck & Co. [Columbia Hospital]*, 355 F.Supp. 1065 (E.D. Wis.1973) the court felt that mechanical services provided by a hospital may be subject to strict liability even though the rendition of professional services is governed by a negligence standard.

In adopting the strict liability as set forth we are making a reasonable extrapolation from the already expanding interpretation of 402A, and clear policy considerations. The surgical patient is without control over the procedures and instruments used upon him. His health and future safety are at the mercy and skill of the treating physicians and the instruments he employs. It is elementary that if a hospital supplies equipment to an operating physician the hospital must appraise themselves of the risks involved and adopt every effort to insure the safety of the equipment chosen. Furthermore, there was testimony in this case to indicate that the defect could have been discovered by a preliminary test on animal bone. To require this minimal technique is not unreasonable and may very well have avoided the injuries to the plaintiff.

## IV. Damages

Our courts have repeatedly held that a verdict will be considered excessive only if it shocks the court sense of

justice. *Weed v. Kerr*, 416 Pa. 233, 205 A.2d 858 (1965); *Bockstoce v. Pittsburgh Railways Co.*, 159 Pa.Super. 237, 48 A.2d 126 (1946).

We have examined the court's instructions to the jury on the elements recoverable of damage in light of the evidence given by Mrs. Grubb and her expert witness on damages, Dr. William Erdman, a specialist in physical and rehabilitative medicine. He observed that Mrs. Grubb has not worked since 1964 and has been largely confined to her home. He suggested a program of therapy might strengthen her motor deficiencies; however, that her home was inadequate for her needs and that she would benefit from living in a facility such as Ingles House, where she would have maintenance, medical care and therapy available. In the alternative Dr. Erdman suggested that she could live in a fire resistant high-rise apartment house with an on call physician available, as well as homemaker services available. He determined Mrs. Grubb to be unemployable and estimated her life expectancy to be 21.22 years. She would have been expected to work to age 65 or another 15 years from trial. In light of this evidence with the obvious physical pain and suffering we are most impressed by the enormity of Mrs. Grubb's injuries rather than the size of the verdict.

Order affirmed.

WATKINS, former President Judge, did not participate in the consideration and decision of this appeal.

JACOBS, President Judge, and VAN der VOORT, J., concur in the result but would not hold the hospital on strict liability.

HOFFMAN and PRICE, JJ., dissent as to Albert Einstein Medical Center and would grant it a new trial because the lower court erred in charging the jury that it could find the Center liable under the Restatement of Torts, Second, § 402A; as to the remaining appellants, HOFFMAN and PRICE, JJ., concur in the result, but believe that the "captain of the ship" doctrine is no longer viable in Pennsylvania.

SPAETH, J., concurs as to the liability of appellants Kauffman, Beller, and Stein, but dissents (1) as to the liability of appellant Albert Einstein Medical Center, on the grounds (a) that there was no basis for a finding of agency as between AEMC and Kauffman, and (b) that the charge on strict liability was error, because strict liability was not pleaded; (2) as to the liability of appellant Stryker, on the ground that there was not sufficient evidence of a defect. In addition, I have examined the arguments made by various of the appellants as to their right to indemnification (not discussed by the majority), and have concluded that the lower court was correct in declining to mold the verdict.