## Oven v. Pascucci

C.P. of Lackawanna County, no. 99-CV-5279.

*James E. Colleran* and *David C. Devine,* for plaintiffs.

*David W. Saba* and *Lara J. Endler,* for defendants Pascucci and Northeastern Eye Institute.

*William D. Longo,* for defendant Cimochowski.

NEALON, *J.,* June 9, 2000—Defendant, Northeastern Eye Institute Inc., has filed preliminary objections seeking to dismiss Count IV of the complaint asserting a cause of action against NEI, based upon LASIK eye surgery performed at NEI by defendant, Stephen E. Pascucci M.D., and postoperative treatment provided by Dr. Pascucci and defendant, Joseph Cimochowski O.D. Since the complaint avers that NEI failed to properly maintain the surgical equipment used and neglected to implement appropriate protocols for LASIK procedures performed at its outpatient surgical facility, NEI may be corporately liable for systemic negligence. Furthermore, in light of the allegations that Dr. Pascucci and Dr. Cimochowski were employees and shareholders of NEI, that professional corporation may be held vicariously liable for the alleged negligence of those physicians.

## I. FACTUAL BACKGROUND

In considering the merits of NEI's preliminary objections, the well-pleaded averments of the complaint must be accepted as true. *Estate of Witthoeft v. Kiskaddon,* 557 Pa. 340, 343 n.1, 733 A.2d 623, 624 n.1 (1999). Plaintiff, Kathryn J. Oven, contends that her treating optometrist, Dr. Cimochowski, referred her to his fellow NEI employee, Dr. Pascucci, to undergo LASIK surgery for myopia.[1] (See plaintiffs' complaint, ¶¶4-6.) Dr. Pascucci performed the LASIK procedure on April 13, 1998, at which time he allegedly "made an improper, shallow and thin cut" which caused "blurred vision" and "loss of clear vision" in Oven's right eye. (*Id.,* ¶¶7-9.)

Oven maintains that Dr. Pascucci attempted remedial surgery on June 12, 1998, and that during a postoperative visit on June 15, 1998, Dr. Cimochowski negligently removed the bandage lens after four unsuccessful at-

---

1. Laser assisted in situ keratomileusis, LASIK, is a relatively new surgical procedure for correction of myopia (nearsightedness), hyperopia (farsightedness) and astigmatism. During the LASIK procedure, after the surface of the eye has been anesthetized by eyedrops, a microkeratome is used to create a flap in the outer layer of the cornea which is folded back to allow an excimer laser access to the exposed corneal surface. Computer-controlled laser beams then remove thin layers of corneal tissue to reshape the curvature of the cornea so that visual images will focus directly onto the retina, thereby improving visual acuity. The corneal flap is returned to its original position without utilizing sutures, and a protective "bandage" contact lens is applied to prevent the eyelid from rubbing against the eye surface as the outer layer of cells regrow and the flap re-adheres. See generally, Lindstrom, R.L., "What Every General Practitioner Should Know About the Laser Vision Correction Revolution," Manag. Care Interface (October 1999); Waring, G.O., "Excimer in situ keratomileusis LASIK," Excimer Lasers in Ophthalmology: Principles and Practice, pp. 295-317 (Martin Dunitz 1997); Kremer, F.B., Dufek, M., Excimer Laser in Situ Keratomileusis," J. Refract. Surg., Vol. 11 (1995).

tempts. (*Id.*, ¶¶12-13.) Oven avers that she has "experienced double and sometimes triple vision" as a result of the improper removal of her bandage lens and has been required to undergo additional surgeries in an effort to correct her vision problems. (*Id.*, ¶¶15-16.)

In Counts I and II of the complaint, Oven asserts claims against Dr. Pascucci for malpractice and lack of informed consent. Count III sets forth a cause of action against Dr. Cimochowski and alleges negligent postoperative treatment. As to NEI, Count IV of the complaint states:

"(26) The negligence and carelessness of Northeastern Eye Institute Inc., increasing the risk of harm and causing the aforementioned harm to Kathryn J. Oven, consisted of the following:

"(a) failing to provide adequately trained personnel to provide care to its patients;

"(b) failing to provide adequate and required equipment and medical devices for the safe performance of the LASIK surgical procedure;

"(c) failing to provide adequate supervision of its employees and agents;

"(d) failing to have policies and protocols in place controlling and governing the performance and timing of LASIK and other surgical procedures and the proper removal of bandage lens [sic].

"(27) Northeastern Eye Institute Inc. is responsible as a matter of law for the conduct of its agents and employees, including [Dr. Pascucci and Dr. Cimochowski]." (*Id.*, ¶¶26-27.)

On February 7, 2000, NEI filed preliminary objections seeking the dismissal of Count IV of the complaint on the grounds that "Pennsylvania law does not recognize a cause of action of corporate or independent negligence against a physician-owned and operated entity such as

Northeastern Eye Institute Inc." (See defendant's preliminary objections, ¶6.) Oven counters, without citation to any legal authority, that the theory of corporate liability does not include a "threshold requirement that [NEI] must play a role in the total health care of the patient before the medical provider is subject to tort liability." (See plaintiffs' memorandum of law, p. 7.) The parties have filed their respective memoranda of law, and following the completion of oral argument on May 31, 2000, this matter was submitted for a decision.

## II. DISCUSSION

### (A) *Standard of Review*

The core issue presented by a demurrer is whether on the facts averred, the law says with certainty that recovery under the theory alleged is impossible. *DeMary v. Latrobe Printing and Pub. Co.,* 2000 WL 10232, ¶5 (Pa. Super. 2000). A demurrer admits all well-pleaded material facts set forth in the complaint, as well as all inferences reasonably deducible from those facts. *Lowther v. Roxborough Memorial Hospital,* 738 A.2d 480, 489 (Pa. Super. 1999). However, the court need not accept the pleader's conclusions of law, unwarranted inferences from facts, opinions, or argumentative allegations. *Wiernik v. PHH U.S. Mortgage Corp.,* 736 A.2d 616, 619 (Pa. Super. 1999).

To sustain a demurrer, it is essential that the complaint demonstrate on its face that the claim being advanced cannot be sustained as a matter of law. *PennDOT v. Wilkinsburg Penn Joint Water Authority,* 740 A.2d 322, 324 (Pa. Commw. 1999). The novelty of a claim or theory in and of itself does not compel the affirmance of a de-

murrer. *Denton v. Silver Stream Nursing & Rehabilitation Center,* 739 A.2d 571, 575 (Pa. Super. 1999). Furthermore, if a doubt exists as to whether a demurrer should be sustained, that doubt should be resolved in favor of overruling the demurrer. *Pacurariu v. Commonwealth,* 744 A.2d 389, 391 n.1 (Pa. Commw. 2000).

## (B) *Evolution of Corporate Liability*

As the character of hospitals changed from purely charitable institutions to largely commercial entities, those health care facilities experienced a corresponding transformation in their civil liability from complete immunity, see *Gable v. Sisters of St. Francis,* 227 Pa. 254, 260-61, 75 A. 1087, 1089 (1910), to vicarious liability for the negligence of its own employees, see *Tonsic v. Wagner,* 458 Pa. 246, 253-54, 329 A.2d 497, 501 (1974), and ultimately to accountability for the malpractice of independent contractor physicians based upon a theory of ostensible or apparent agency. *Capan v. Divine Providence Hospital,* 287 Pa. Super. 364, 368-69, 430 A.2d 647, 649-50 (1980); *Gurevitz v. Piczon,* 42 D.&C.4th 308, 316-17 (Lacka. Cty. 1999). In *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), the Supreme Court of Pennsylvania further expanded the potential liability of hospitals by adopting the theory of corporate liability which is based upon the systemic or institutional negligence of the hospital itself rather than the conduct of individual employees or physicians. To that end, the *Thompson* court recognized the following four duties with respect to a hospital: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment . . . ; (2) a duty to select and retain only competent physicians . . . ; (3) a duty to oversee all per-

sons who practice medicine within its walls as to patient care . . . ; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients . . . ." *Id.* at 339-40, 591 A.2d at 707. (citations omitted)

Unlike vicarious liability for the torts of an actual or ostensible agent, corporate negligence is not dependent upon the malpractice of a third party such as a physician or nurse. *Welsh v. Bulger,* 548 Pa. 504, 513, 698 A.2d 581, 585 (1997); *Moser v. Heistand,* 545 Pa. 554, 558, 681 A.2d 1322, 1325 (1996). By way of illustration, a hospital may be liable to a patient who suffers harm due to a substandard protocol established by the hospital even though the physician may have acted appropriately by following or adhering to that institutional policy. See "Ockham's Scalpel: A Return to a Reasonableness Standard," 43 Vill. L. Rev. 321, 356 (1998). Therefore, if an infection control committee of a hospital formulates a deficient procedure for changing intravenous catheter sites, *Edwards v. Brandywine Hospital,* 438 Pa. Super. 673, 685-86, 652 A.2d 1382, 1388 (1995), or a hospital permits a physician to perform surgery within its facility knowing that [s]he is not qualified to perform the procedure, *Welsh, supra,* at 515-16, 698 A.2d at 586, an injured patient may recover damages for corporate negligence.

In his dissenting opinion in *Thompson,* Justice Flaherty opined that "[i]n adopting this new theory of liability, the majority is making a monumental and ill-advised change in the law of this Commonwealth." *Id.* at 343, 591 A.2d at 709 (Flaherty, J., dissenting). Advocating a rejection of the principle of corporate negligence, Justice Flaherty remarked:

"Further, in recognizing 'corporate liability,' there is no logical basis upon which to limit this extension of liability to hospitals alone. Rather, all corporations, regardless of their lines of business, will be assertedly responsible for the torts of their independent contractors. Fearfully, such extensions of liability could well follow from the present decision." *Id.* at 344, 591 A.2d at 709 (Flaherty, J., dissenting). See also, Expansion of Hospital Liability Under the Doctrine of Corporate Negligence: *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), 65 Temp. L. Rev. 787, 797 n.87 (1992). Although the Supreme Court of Pennsylvania has had occasion to discuss the doctrine of corporate negligence in the context of a hospital, it has not yet addressed the extension of corporate liability to other health care facilities and providers.

### (C) *Application of Corporate Liability to Entities Other Than Hospitals*

In the wake of *Thompson,* several trial courts have considered the viability of a systemic negligence claim against various types of health care organizations and providers. In *Risser v. Pepper,* no. 4720 S 1992 (Dauphin Cty. March 29, 1996), a patient who suffered nerve damage following jaw surgery sued the dentist who performed the procedure as well as the three-dentist partnership, Central Pennsylvania Oral Maxillofacial Surgeons, which owned the facility where the surgery was conducted. The patient contended that the dentist, Larry Pepper D.M.D., was not qualified to perform the surgical procedures at issue and that CPOMS was corporately liable since it "knew or should have known that Dr. Pepper, was not competent to perform such procedures." *Id.*

at p. 2. Writing on behalf of the court en banc, Dauphin County President Judge Kleinfelter denied the request to dismiss the corporate negligence claim and held:

"Defendants herein argue that *Thompson* applies only to hospitals and that the theory of corporate liability announced in that case has not been expanded to professional corporations providing medical care outside of the hospital setting. Yet that is exactly what is implied in *Kaskie [v. Wright,* 403 Pa. Super. 334, 589 A.2d 213 (1991)]. Furthermore, it is apparent to all that in this day of rapid changes in the delivery of health care that many surgical procedures are being performed on an outpatient basis by various forms of medical 'groups,' 'clinics,' 'associations' and 'partnerships.' We are not prepared today to say as a matter of law that plaintiffs are barred in a negligence claim against CPOMS for liability for failing to hire or accept into partnership only those physicians who are competent either by board certification or experience." *Id.* at p. 4.

In so holding, the *Risser* court expressly overruled an earlier holding of another three-judge panel in *Firestone v. Pepper,* no. 1643 S 1988 (Dauphin Cty. Dec. 16, 1992). *Risser,* at n.3 ("we depart today from that languge in *Firestone* which suggested that a claim of corporate negligence is only applicable to hospitals. As we have stated above, *Thompson v. Nason Hospital* does not limit its holding to hospitals").

Similarly, in *Patel v. Himalayan Int'l Inst. of Yoga Science and Philosophy,* no. CV-94-1118, Vanaskie, J. (M.D. Pa. Sept. 30, 1996), a participant in the holistic health program at the Himalayan Institute brought a personal injury action against the institute and physicians affiliated with its "self-transformation program." Alleging a "failure to provide competent holistic medical serv-

ices," the plaintiff advanced a *Thompson* claim against the institute. In denying the request to dismiss the cause of action for institutional liability, Chief U.S. District Judge Thomas I. Vanaskie reasoned:

"The malpractice claim against the institute . . . stands on a different footing. There is no dispute that the requisite health care relationship existed between the institute and the plaintiff. The institute's argument that *Thompson v. Nason Hospital, supra,* which applied the doctrine of corporate negligence to a health care facility, is limited solely to hospitals, is without merit. In this case, there is no question that the institute held itself out as providing health care services. Under these circumstances, function must prevail over form. The institute itself may be held liable for failing to uphold the proper standard of care owed its patient." *Id.* at pp. 40-41.

Shortly thereafter, our neighboring court in Monroe County considered the merits of a corporate liability claim asserted against a physician-operated professional corporation. Rejecting the defense argument that corporate negligence claims are confined to hospitals, Judge Jerome P. Cheslock stated:

"In accordance with *Thompson* which extended corporate negligence to include that of a hospital, this court finds that extending corporate negligence to a professional corporation like that of defendants' is justified. Defendants created a professional corporation for the purpose [of] diagnosing and treating patients. Plaintiffs may sustain a cause of action against defendants so long as they can show that defendants breached the duties enunciated in *Thompson v. Nason Hospital.* Therefore, defendants' preliminary objections in the nature of a demurrer is dismissed." *Rivera v. Lawrence,* no. 4325 Civil 1998, Cheslock, J., at p. 7 (Monroe Cty. Oct. 9,

1998). Compare *Remshifski v. Kraus,* no. 1845 Civil 1992, Miller, J., at pp. 5-6 (Monroe Cty. Sept. 8, 1995) (granting medical professional corporation's summary judgment motion on the basis that corporate negligence "has not been extended to entities other than hospitals").

In contrast, in *Milan v. American Vision Center,* 34 F. Supp.2d 279 (E.D. Pa. 1998), a patient's corporate negligence claim against an optometrist's office, American Vision Center was summarily dismissed. Unfortunately, the *Milan* decision does not indicate whether the litigation involved on-site surgery or noninvasive clinical treatment. Although the optometrist's office had argued that "the Pennsylvania doctrine of corporate negligence established in *Thompson* applies only to hospitals, not to optometrist's offices," *id.* at 280, the *Milan* court initially observed "[t]hat *Thompson* concerned hospitals does not necessarily mean that the Pennsylvania Supreme Court will not in the future extend the doctrine of corporate liability to other health care organizations, or indeed (as Justice Flaherty feared), to all corporations." *Id.* at 281. Nevertheless, opining that an optometrist's office does not play a gatekeeping role in the care of patients, the federal district court "conclude[d] that the courts of Pennsylvania will, when faced with the issue, decline to recognize corporate negligence in the context of optometrist's offices." *Id.* at 282.

However, rather than restrict the application of *Thompson,* the Superior Court of Pennsylvania has expanded the principle of corporate negligence to health care entities other than hospitals. In *Shannon v. McNulty,* 718 A.2d 828 (Pa. Super. 1998), a health maintenance organization had interjected itself into the medical decisions and care of its subscribers by utilizing triage nurses to handle emergency telephone calls and thereafter direct the sub-

scriber to an appropriate physician or hospital. The trial court rejected the plaintiff's contention that her HMO could be held corporately liable for the premature delivery and subsequent death of her child, resulting from the failure of the triage nurse to immediately refer the plaintiff to a physician or hospital for a cervical examination and fetal stress test. In reversing the lower court ruling, the Superior Court found that "while these [HMO] providers do not practice medicine, they do involve themselves daily in decisions affecting their subscriber's medical care" such that they may "be held corporately liable for a breach of any of the *Thompson* duties which causes harm to its subscribers." *Id.* at 835-36.

Despite the amplification of the corporate liability doctrine in *Shannon,* the Bradford County Court of Common Pleas later declined to apply the theory of corporate negligence to the Guthrie Clinic. See *Johnson v. Wiseman,* 3 Bradford 95, 97-98, 4-5 (1998). Three members of our own common pleas court have likewise concluded as a matter of law that the Penn State Geisinger Clinic may not be held corporately liable since it is a primary care facility, not a comprehensive health care center. See *Dibble v. Penn State Geisinger Clinic,* 42 D.&C.4th 225 (1999); *Brewer v. Penn State Geisinger Clinic,* no. 98-CV-733, Cottone, S.J., at p. 8 (Lacka. Cty. March 31, 2000); *Hodle v. Fino,* no. 99-CV-6006, Barrasse, J., at pp. 4-5 (Lacka. Cty. May 3, 2000) ("[t]he modern trend in Pennsylvania common pleas courts decisions is that the doctrine of corporate liability does not extend to clinics and doctors' groups"). Additionally, a subsequent panel of the Dauphin County court has determined, albeit without any acknowledgment of President Judge Kleinfelter's contrary ruling in *Risser,* that "the corporate negligence doctrine has not been extended to enti-

ties other than hospitals" and reasoned "that this doctrine applies only to hospitals and not to physician practices like Cardiovascular Surgical Institute." *Dowhouer v. Judson,* no. 2548 S 1997, Lewis, J., at p. 6 (Dauph. Cty. March 10, 2000).

More recently, the federal district court in *Fox v. Horn,* 2000 WL 49374 (E.D. Pa. 2000), expanded *Thompson* liability to a medical professional corporation. In that case, an inmate at the State Correctional Institute at Graterford sued certain doctors and Correction Physician Services Inc., which had contracted to provide medical services at Graterford and had provided the physicians in question. The inmate challenged the "CPS policies, or lack thereof, with regard to the medical treatment of inmates and the hiring of doctors," as well as "the adequacy of policies that CPS used to supervise [the attending physician]." *Id.* at **5-6. Relying upon the *Shannon* court's application of "corporate negligence in the health care context to HMOs," the district court predicted that corporate liability would be extended to a medical group such as CPS. *Id.* at *8. See also, "Liability and Indemnity Issues for Integrated Delivery Systems," 40 St. Louis U.L.J. 457, 462 (1996) (discussing corporate liability of a managed care entity for utilization review and cost containment management resulting in harm to a patient).

## (D) *Outpatient Surgical Facilities*

The LASIK procedure is performed on-site at NEI's surgical facility with equipment that Oven contends was not properly provided and maintained by NEI. (See plaintiffs' complaint, ¶26(b).) As identified in the complaint, the NEI operation is similar in some respects to a free-

standing surgical outpatient facility, FSOF, which historically has been distinguished from a private practice office. See *e.g.*, *Birth Control Centers Inc. v. Reizen*, 508 F. Supp. 1366, 1385 n.29 (E.D. Mich. 1981). Based upon Oven's allegations, it is conceivable that NEI violated the first duty articulated in *Thompson* by neglecting to properly calibrate and maintain the suction ring, microkeratome or excimer laser used during Oven's LASIK procedure, as a result of which an improper "shallow and thin cut" was made.

Additionally, Oven submits that NEI failed to retain adequately trained personnel to perform the procedure and neglected to implement appropriate protocols for LASIK surgery and post-operative treatment. Even prior to the advent of corporate liability, Pennsylvania courts recognized that hospitals and professional corporations have a duty to monitor the competency of their health care professionals. For example, in *Kaskie v. Wright*, 403 Pa. Super. 334, 589 A.2d 213 (1991*), alloc. denied,* 529 Pa. 634, 600 A.2d 954 (1991), a patient attempted to assert a claim for lack of informed consent against a physician who allegedly was an alcoholic and unlicensed to practice medicine in Pennsylvania. On appeal, the Superior Court affirmed the dismissal of the case on the basis of the expiration of the statute of limitations and the inapplicability of the informed consent doctrine to information involving the physician himself rather than the surgical procedure at issue.[2] In so holding, the *Kaskie* court expressly stated:

---

2. The Superior Court of Pennsylvania subsequently clarified *Kaskie* and held that if the patient specifically questions the surgeon concerning his "competence, experience and expertise" and the surgeon "when answering [the] patient's inquiries, misinforms the patient . . . and misleads the patient into believing that the hands of an experienced

"Matters such as personal weaknesses and professional credentials of those who provide health care are the responsibility of the hospitals employing them, *the professional corporations who offer their services,* or the associations which are charged with oversight. *Their failure to fulfill their obligations in this regard becomes a matter of negligence, and it is from them that recovery must be sought."* *Id.* at 341, 589 A.2d at 217. (emphasis added)

Thus, irrespective of the applicability of *Thompson* liability to medical groups, the foregoing language from *Kaskie* reflects that a professional corporation such as NEI has long been legally responsible for monitoring and evaluating the competency of health care professionals who practice there. *Kaskie* clearly states that if a professional corporation does not satisfy its duty to retain and offer only competent medical personnel, an injured patient may recover from that corporation for negligence. Consequently, the second duty identified in *Thompson* would likewise be applicable to the case sub judice based upon the averments of Oven's complaint.

A person may not be a suitable candidate for LASIK surgery depending upon the patient's degree of refractive error, pupil size, corneal curvature and thickness, and other preexisting medical conditions. See *e.g.,* Waring, G.O., "Excimer Laser in Situ Keratomileusis Under a Corneal Flap for Myopia of 2 To 20 Diopters," Am. J. Ophthalmol., 121:143-55 (1996); Marinho, A., "LASIK for High Myopia: One Year Experience," Ophthalmic

---

surgeon will be performing the operation," the surgeon "does not have the true consent of that patient" and may be "subject to a claim of lack of informed consent." *Duttry v. Patterson,* 741 A.2d 199, 201-202 (Pa. Super. 1999).

Surg. Lasers, 27 (Suppl) (1996). Granting Oven all reasonable inferences deducible from her allegations, see *Main Line Health Inc. v. CAT Fund,* 748 A.2d 66, 69 n.13 (Pa. Commw. 1999), the thickness of her cornea or the presence of other factors arguably may have contributed to "an improper, shallow and thin cut" being made, as alleged in the complaint. However, the LASIK surgery protocols and eligibility criteria that were allegedly promulgated by NEI may have enabled Dr. Pascucci to perform the procedure and Dr. Cimochowski to remove the protective bandage lens when it was not appropriate to do so. If the attending physicians merely followed NEI policies by the manner in which they operated on Oven and treated her postoperatively, liability could be imposed upon NEI based upon the fourth duty recognized in *Thompson.*

The averments of the complaint suggest that NEI is a separate entity with a distinct identity which offers out-patient surgery at its corporate facility. Pennsylvania courts have been more inclined to extend *Thompson* liability to professional corporations which own and operate enterprises where on-site surgery is performed. See *e.g, Risser, supra* (jaw surgery). Compare *Dibble, supra* (corporate negligence claim rejected in a malpractice action alleging failure to diagnose cancer rather than operative treatment). Since a demurrer may only be granted in cases where it is clear and free from doubt that the pleader cannot recover, and all doubts must be resolved in favor of denying the preliminary objections, see *Edwards v. Germantown Hospital,* 736 A.2d 612, 614 (Pa. Super. 1999), Oven's corporate liability claim will survive the pleadings stage of this litigation.

Accordingly, Oven will be afforded the opportunity to explore via discovery whether NEI has committed

systemic negligence which caused Oven's unfavorable outcome. If the parties' pretrial investigation does not establish corporate negligence by NEI which increased the risk of harm to Oven, NEI may revisit the viability of Oven's corporate liability claim by filing a motion for summary judgment. In the interim, the preliminary objections seeking to dismiss Count IV of the complaint will be denied.

### (E) *Vicarious Liability of NEI*

Even if NEI cannot be held corporately negligent, its preliminary objections should be denied since NEI may nonetheless be vicariously liable for the actions of Dr. Pascucci and Dr. Cimochowski. In the complaint, Oven avers that Dr. Pascucci and Dr. Cimochowski were shareholders and agents of NEI. As such, NEI may be held accountable for their alleged negligence based upon the principle of respondeat superior. *Sinclair by Sinclair v. Block*, 406 Pa. Super. 540, 558 n.20, 594 A.2d 750, 760 n.20 (1991), *modified on other grounds*, 534 Pa. 563, 633 A.2d 1137 (1994) (a professional corporation is liable for any malpractice committed by its officers, shareholders or agents while they are rendering professional services). See also, *Grubb v. Albert Einstein Medical Center*, 255 Pa. Super. 381, 397, 387 A.2d 480, 488 (1978) (members of a medical partnership may be held liable for torts committed by a co-partner acting within the scope of the partnership's business). Hence, NEI's demurrer will likewise be denied on the grounds that NEI may be held vicariously liable.

### ORDER

And now, June 9, 2000, upon consideration of the preliminary objections of defendant, Northeastern Eye In-

stitute Inc., seeking to dismiss Count IV of the complaint, the memoranda of law submitted by the parties and the oral argument of counsel on May 1, 2000, it is hereby ORDERED and DECREED that:

1. The preliminary objections of defendant, Northeastern Eye Institute Inc., are DENIED; and

2. Within 20 days of the date of this order, defendant, Northeastern Eye Institute Inc., shall file a responsive pleading to the complaint.