## Nunemacher v. Sensinger

*Michael S. Bloom,* for plaintiffs.
*Frank Procyk,* for defendants.
*Jason Banonis,* for additional defendants.

NANOVIC, *P.J.,* December 15, 2005—

## INTRODUCTION

On October 13, 2001, the plaintiffs, Thomas Nune-macher and Angelina Nunemacher (Husband and Wife),[1] were injured in a motor vehicle accident that occurred when the defendant, Marcus Sensinger, turned onto West Mahoning Drive, a two-lane macadamed highway on which the Nunemachers were riding their motorcycle: Husband, as operator, and Wife, his passenger. The accident happened in this county, in Mahoning Township.

The Nunemachers commenced suit by complaint against Sensinger who, in turn, joined the Nunemachers as additional defendants asserting their sole liability for the injuries of one another and, alternatively, seeking contribution.[2] In their complaint, the Nunemachers claimed that Sensinger negligently pulled out in front of them causing the injuries they sustained in the accident. In his joinder complaint against the Husband, Sensinger

---

1. At the time of the accident, the plaintiffs, Thomas Nunemacher and Angelina Nunemacher, were married to one another. The Nunemachers separated in May 2002, and have since divorced.

2. Sensinger's joinder complaint against Wife was withdrawn by stipulation shortly before trial.

alleged that the Husband negligently operated his motorcycle and was the real cause of Wife's injuries.

Following a two-day jury trial, the jury returned a verdict in favor of Sensinger and against the Nunemachers, finding Sensinger was not negligent. The jury further found in favor of Wife and against Husband on the issues of liability raised in the joinder complaint and returned a verdict awarding Wife medical expenses only.

In their motion for post-trial relief now before us, the Nunemachers claim that we erred in allowing Sensinger's liability expert, Joseph Tarris, to express opinions he was not qualified to give and which were not based on facts in evidence. Wife individually claims that the jury's verdict was against the weight of the evidence in not awarding any compensation for pain and suffering. Husband further claims that a miswording in the Wife's verdict slip confused the jury and influenced them to find against him on the joinder complaint.

## I. FACTS AND PROCEDURAL HISTORY

On the day of the accident, Sensinger exited his driveway and made a left-hand turn onto the eastbound lane of West Mahoning Drive. While Sensinger was making his turn, Husband was traveling east on West Mahoning Drive, approaching Sensinger's driveway from the west. West Mahoning Drive is aligned generally in an east/west direction and is intersected on the north by Sensinger's driveway.

According to Husband, he was approximately 300 feet away from Sensinger when he first observed Sensinger's vehicle stopped at the end of the driveway. (N.T., vol. I,

pp. 20-21.) At trial, Husband was uncertain of his speed at the time he first noticed Sensinger's vehicle but believed he was traveling close to 45 miles per hour, the posted speed limit at the location of the accident. Husband also recalled that as he approached Sensinger's driveway, there were two vehicles ahead of him driving in the same direction. Wife estimated these vehicles to be 100 to 200 feet in front of them. (N.T., vol. I, p. 67.)

As soon as the two vehicles ahead passed Sensinger's driveway, Husband testified Sensinger slowly and unexpectedly pulled out in front of him. At this point, Husband estimated he was 100 to 150 feet from the intersection between West Mahoning Drive and Sensinger's driveway. (N.T., vol. I, p. 22.)

The motorcycle Husband was operating had independent rear and front brakes for the rear and front tires respectively; the rear brake was operated by a foot pedal and the front brake by a lever on the handlebars. (N.T., vol. I, pp. 23-24, 143.) When Husband first saw Sensinger pulling out he began to brake: he applied his rear brake fully and his front brake a little. (N.T., vol. I, pp. 23, 51-53, 57.) As he did so, the rear wheel locked up, skidding, with the motorcycle continuing to move forward in a straight line. (N.T., vol. I, pp. 82-83.) When Husband realized a collision with Sensinger's vehicle was imminent if he remained upright—at this point he was approximately 50 to 75 feet from Sensinger's car—he deliberately lowered his motorcycle to the ground onto its right side. (N.T., vol. I, pp. 24-25, 55-56, 59-60, 85.) The motorcycle slid along the road for approximately 23 feet before coming to rest; neither vehicle came into contact with the other. (N.T., vol. I, pp. 168, 178.)

Sensinger's account of the accident was as follows. From where he was stopped at the end of his driveway, he had a clear view of about 225 feet looking west along West Mahoning Drive. Before exiting his driveway, he looked in both directions several times, at least twice looking west, observed no oncoming traffic, and had already completed his turn and was heading east on West Mahoning Drive when he heard brakes screeching, looked in his rearview mirror, and observed the Nunemachers' motorcycle lying on the road behind him. Upon seeing this, Sensinger turned around and returned to his driveway where, for the first time, he saw Husband and Wife.[3] Sensinger estimated his speed at the time he heard the sound of brakes behind him to be 25 miles per hour. (N.T., vol. I, p. 135.)

Wife testified that her right wrist and elbow were injured in the accident. The same day she was transported to the Gnaden Huetten Memorial Hospital and released after receiving a splint for her wrist. Two days later she visited an orthopedic doctor and a cast was placed on her wrist. This was followed by two weeks of physical therapy, after which the injuries she sustained to her wrist and elbow appeared to have healed.

When pain returned in her elbow, Wife went to see Dr. Jay Talsania, an orthopedic specialist, who first exam-

3. Husband was knocked unconscious in the accident. He was medivaced to the Lehigh Valley Hospital and did not regain consciousness until four days later. Husband sustained serious head injuries in the accident. Husband testified that after the accident he also experienced short-term memory loss, headaches and dizziness. Husband had no recollection of what occurred between the point when he began braking to avoid contact with Sensinger's vehicle and when he regained consciousness in the hospital. (N.T., vol. I, pp. 25, 56.)

ined her in January 2002, three months after the accident. At this time, Wife was complaining of a "snapping" sensation on the inside part of her elbow, with increasing pain and a limited range of motion of the joint. (Talsania deposition, pp. 13-17.) Several months of conservative treatment proved unsuccessful, at which time Dr. Talsania operated on Wife's right elbow.

The surgery consisted of excising a portion of the triceps muscle and connective tissue, and shaving four millimeters from the cortical bone. This surgery was followed by home therapy. Within two to three months of the surgery, Wife testified that her elbow had returned to its pre-accident condition. Dr. Talsania did not treat Wife for any injury to her right wrist, which Wife admitted had completely resolved by the end of 2001.

Prior to this accident, Wife had injured her right arm and been operated on twice: in 1997 and again in 1998. This injury was work-related, occurred in 1997, and included a detached ulnar nerve. Wife had not fully recovered from this injury prior to the accident, continued to experience pain in her wrist and elbow, and was still receiving medical treatment. She also had not returned to work and was unemployed.

At the time of the accident, the Nunemachers were accompanied by Jose Cruz who was riding behind them on his motorcycle at a distance of at least 50 feet. (N.T., vol. I, pp. 96, 98.) Cruz' testimony as to how the accident happened, with Sensinger pulling out unexpectedly in front of them and with Husband braking and taking evasive action to avoid a collision, was similar to the Nunemachers'. (N.T., vol. I, p. 101.) Cruz testified that he also braked and left a skid mark of approximately 20

feet in length behind (*i.e.,* to the west of) the skid mark left when Husband braked his motorcycle. (N.T., vol. I, pp. 101-103, 105.)

Two sets of skid marks were observed by the police who investigated the accident as well as by Sensinger's expert, Joseph Tarris; however, whether the skid marks were caused by two motorcycles, as Cruz testified, or by one motorcycle, Husband's, as Tarris concluded, became a major issue at trial.[4] Cruz was not injured in the accident and was able to stop without laying his motorcycle on the ground. (N.T., vol. I, p. 103.)

Defendant's expert witness, Joseph Tarris, was a licensed civil engineer and an accredited accident reconstructionist. Tarris testified that he had investigated or reconstructed more than a 1,000 accidents and that more than 100 of these dealt with motorcycles. (N.T., vol. I, p. 143.) He further testified that as part of his training and expertise he was familiar with the independent braking systems of motorcycles and how they function in the operation of a motorcycle. (N.T., vol. I, pp. 143, 150.) As part of his investigation, Tarris reviewed the police accident report, witness statements and photographs, and conducted a site visit on January 5, 2002, approximately 12 weeks after the accident, at which time

---

4. The Nunemachers' argument that the police independently determined Cruz' motorcycle was the cause of the western skid mark is misleading. The police initially thought both skid marks were attributable to Husband's motorcycle. Only after Cruz insisted that the western most mark was caused by his motorcycle did the police attribute this mark to Cruz. (N.T., vol. I, p. 103.) Since the qualifications of the investigating police officer to render this opinion were never presented, at best, the police accident report served as a basis for impeaching Tarris on this issue, not as substantive evidence.

he took measurements and determined the sight line from Sensinger's driveway looking west along West Mahoning Drive. (N.T., vol. I, pp. 156-57, 159.) Tarris also performed a speed analysis of the Husband's motorcycle and an avoidance analysis. (N.T., vol. I, p. 162.)

Tarris found the sight distance from the middle of Sensinger's driveway looking to the west along West Mahoning Drive to be 400 feet. (N.T., vol. I, p. 163.) He also found that from the point where Sensinger was stopped, West Mahoning Drive curves to the right up a slight incline with a grade of 6.6 percent. (N.T., vol. I, p. 161.)

Critical to Tarris' speed analysis was his conclusion that the two skid marks he observed on West Mahoning Drive were caused by Husband's motorcycle. (N.T., vol. I, p. 182.) The most distant skid mark from Sensinger's driveway, that which Tarris termed the western mark, began approximately 120 feet from the middle point of the driveway and was measured to be 41 feet in length. (N.T., vol. I, pp. 167-68.) The second skid mark, which Tarris termed the eastern mark, was measured at 78 feet and began approximately 25 to 30 feet after the eastern-most edge of the western mark. (N.T., vol. I, pp. 164, 168, 184.)[5]

---

5. The police report documented the length of the western mark to be 45 feet and that of the eastern mark to be 83 feet. While differing from Tarris' measurements, Tarris explained this difference to be attributable to time: Tarris did not visit the site and take his measurements until approximately 12 weeks after the accident and, as stated by Tarris, skid marks fade with time. (N.T., vol. I, p. 168.) Tarris also testified that the police report did not identify the length of the gap

Tarris testified that from his investigation and visual inspection of the site he was convinced that both skid marks were caused by the same motorcycle, Husband's, and that both marks were perfectly aligned with one another. (N.T., vol. I, pp. 164-65, 169-70.) When confronted on cross-examination with Cruz' testimony that the western mark was caused by Cruz' motorcycle, Tarris responded that he was aware of Cruz' testimony, that it did not affect the opinion he formed after his own investigation, and that he believed Cruz was mistaken. (N.T., vol. I, pp. 181-82, 207.)

Tarris also testified that it is not uncommon when investigating motor vehicle accidents to find spaces or breaks in the skid marks caused by the same vehicle, and that various explanations can account for these gaps, including a momentary and partial release of pressure from the brake pedal, permitting the rear wheel to rotate, and then again applying the brake fully, causing the rear wheel to lock, and leaving an additional skid mark. (N.T., vol. I, pp. 185-87.) According to Tarris, the distance he observed between the skid marks represented a half second in elapsed time. (N.T., vol. I, p. 187.)

Based upon Tarris' investigation, including Husband's admission that he only partially applied the front brakes, Tarris concluded that Husband's speed when he began braking—that point being represented by the western edge of the western skid mark—was 50 miles per hour and that had Husband made complete use of the braking

---

between the two marks and although the space between these marks may have been less at the time of the accident, for purposes of his calculations he used the distance of 25 to 30 feet measured by him when he visited the site. (N.T., vol. I, pp. 184-85.)

system of his motorcycle, including applying the front brakes fully, it would have taken approximately 119 to 120 feet to stop. (N.T., vol. I, pp. 170-76.) Under the same conditions—making complete use of the braking capacity of the motorcycle and applying the brakes at the same point—at a speed of 45 miles per hour (*i.e.,* the applicable speed limit), Tarris stated Husband would have been able to stop before reaching the driveway. (N.T., vol. I, p. 175.) Tarris further testified that if Husband's speed was in fact 50 miles per hour, based upon the time it would ordinarily take for a stationary driver to pull out from the Sensinger driveway and accelerate to a speed of 25 miles per hour, Husband would not have been within Sensinger's view at the time he left his driveway. (N.T., vol. I, p. 177.) Tarris ultimately opined that the cause of the accident was Husband's failure to control his motorcycle. (N.T., vol. I, p. 179.)

At the conclusion of the testimony, the jury was instructed to answer two verdict slips, one for Husband and one for Wife. On both, the jury returned a verdict in favor of Sensinger and against the Nunemachers on the question of negligence. At the time the jury announced its verdict and before the jury was dismissed, it was brought to the court's attention by counsel that an error existed on Wife's verdict slip. This verdict slip, which in format was identical to Husband's, incorrectly directed the jury not to answer any further questions if it found Sensinger was not negligent.[6]

---

6. The verdict slip for Husband was correct. Having found Sensinger to be non-negligent, the need to also evaluate whether or not Husband was negligent for purposes of comparative negligence was moot. In contrast, notwithstanding the jury's finding in favor of Sensinger on

Upon learning of this error, the jury was advised of the error in the verdict slip, instructed to continue their deliberations, and directed to determine whether or not Husband was negligent, whether such negligence, if any, was a substantial factor in causing Wife's injuries and, if so, to assess the amount of Wife's injuries. (N.T., vol. II, pp. 75-76.) After further deliberations, the jury returned a verdict for Wife and against Husband on the issue of negligence, found Husband's negligence was a substantial factor in causing Wife's injuries, and, in answer to special interrogatories, awarded Wife her medical expenses of $5,453.29 but made no award for pain and suffering. After announcing this verdict, no objection was raised by any of the parties and the jury was discharged.

## II. DISCUSSION

### A. *Expert Testimony of Tarris*

The Nunemachers question the competency of Tarris' expert witness testimony on two bases: first, that his qualifications as an accident reconstructionist did not qualify him to testify as to the operation of a motorcycle and second, that the factual basis for his opinions conflicted with the description of the facts provided by the Nunemachers and Cruz.

---

the issue of negligence, because of the issues raised in the joinder complaint against the Husband, it was still necessary on the Wife's verdict slip for the jury to determine whether the Husband was negligent and whether any negligence by him was a cause of Wife's injuries.

## (1) Competency of Expert To Testify

As to the first issue, the Nunemachers do not dispute that Tarris has the necessary qualifications to testify as an accident reconstructionist—to render opinions as to how an accident happened. (N.T., vol. I, p. 137); see also, *Davis v. Steigerwalt,* 822 A.2d 22, 25 (Pa. Super. 2003) (noting the liberal standard for testing the qualifications of an expert—whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation—and if qualified, that the witness may testify and the weight to be given his testimony is for the trier of fact to determine). They challenge instead his competence to offer opinion testimony that "the cause of the accident was, in part, the manner in which [Husband] braked his motorcycle." (Nunemacher brief in support of their motion for post-trial relief, p. 6.) Essentially, the Nunemachers argue that a distinction exists between how a motorcycle operates—its design and capabilities—and how the motorcycle was operated: as to the former, the Nunemachers appear to concede Tarris was competent to testify; as to the latter, in the Nunemachers' opinion, he was not. While the distinction the Nunemachers seek to make may be a true one—certainly it would be if Tarris had been permitted to testify to Husband's motives (*i.e.,* why he braked the way he did)—when fairly examined, the Nunemachers' argument lacks support in the record.

In being able to reconstruct a motorcycle accident, Tarris testified that it is necessary for an accident reconstructionist to understand not only the principles of mathematics, physics, and engineering but also how a

motorcycle operates mechanically, including an understanding of how the motorcycle braking system works. (N.T., vol. I, p. 150.) Tarris testified specifically that he understood the functions of the braking system and how they relate to the operation of a motorcycle. (N.T., vol. I, pp. 142-43.) Tarris further testified that part of the field of accident reconstruction is an understanding of accident avoidance—"what kind of opportunity [a driver] would have had to avoid impact." (N.T., vol. I, pp. 147-48.)

In this case, it was Husband who testified that he applied the rear brake fully, causing the wheel to lock and thereby leave skid marks, and intentionally applied the front brake only partially because of his belief that if he made full use of the front brake, the front wheel would lock, he would loose the ability to steer, and he risked having the motorcycle flip end over end. (N.T., vol. I, pp. 24, 59.)[7] In analyzing the physical data, Tarris took into account Husband's testimony and explained how it affected his calculations of Husband's speed—the more Husband actually applied the front brake the greater would be Husband's pre-braking speed—and how the stopping distance of Husband's motorcycle would have been affected had Husband fully utilized the entire braking system of his motorcycle. (N.T., vol. I, pp. 172-74, 177-78, 203.)

---

7. On cross-examination by the Nunemachers' counsel, Tarris testified that the belief that use of the front brake will cause the motorcycle to somersault is a myth, not supported by fact, and that in not using the front brake fully, a great percentage of the braking capacity of a motorcycle is lost. (N.T., vol. I, p. 198.)

Contrary to the Nunemachers' assumption, Tarris did not testify as to the manner in which Husband braked, Husband did. We see no error and believe Tarris was properly qualified to express the opinions he did and, in doing so, taking into account Husband's testimony.[8]

## (2) Factual Basis of Expert Testimony

The Nunemachers' second argument—the insufficiency of a factual basis to support Tarris' opinions—focuses entirely on the premise that "Tarris' testimony that both skid marks came from the Nunemacher motorcycle was unsupported by the evidence." (Nunemacher brief in support of their motion for post-trial relief, p. 7.) The record, again, does not support this premise.

In concluding that both the western and eastern skid marks were left by Husband's motorcycle, Tarris stated that he personally visited the accident site, visually examined the skid marks, measured them, and that they were perfectly aligned. At the speed Tarris calculated Husband was traveling, the separation of the skid marks represented a split second in elapsed time and, according to Tarris, was easily explainable as a momentary relaxing of pressure on the rear brake. Tarris took photo-

---

8. The Nunemachers rely heavily on Tarris' statement during voir dire on qualifications that "I do not consider myself an expert in the operation of a motorcycle, just as I don't consider myself an expert in the operation of a car." (N.T., vol. I, p. 149.) We believe the Nunemachers read more into this statement than was intended. Certainly in the context of the questions asked of Tarris on voir dire, it was clear that Tarris was qualified by education, training and experience to testify how this accident happened, and how the manner in which Husband braked affected the happening of the accident.

graphs of the skid marks and their alignment; these photographs were admitted into evidence and were shown to the jury who could see for themselves what Tarris was describing.

Additionally, Husband testified that soon after the two vehicles ahead of him (a distance which Wife estimated to be 100 to 200 feet) passed Sensinger's driveway, Sensinger pulled out and that Husband was 100 to 150 feet from Sensinger's driveway when he first began braking. Consistent with this testimony, the western edge of the western skid mark was measured by Tarris at 120 feet from the middle of the driveway; in contrast, the western edge of the eastern mark started at approximately 49 to 54 feet from the middle of the driveway. Further, in Wife's testimony she confirmed that when the Husband began braking, he continued in a straight line.

"In Pennsylvania, there are no legal restrictions on the information relied upon by an expert, save that the information is made known to the expert at or before the hearing and that the information itself is admissible or is of a type reasonably relied upon by experts in the field." *Readinger v. W.C.A.B. (Epler Masonry),* 855 A.2d 952, 956 (Pa. Commw. 2004), *appeal denied,* 581 Pa. 709, 867 A.2d 525 (2005).

"Traditionally, the opinion testimony of an expert must be narrowly limited to evidence of which he has personal knowledge, which is uncontradicted on the record or which is proffered on an assumed state of facts reasonably shown by the record. *Houston v. Canon Bowl Inc.,* 443 Pa. 383, 385, 278 A.2d 908, 910 (1971); *Battistone v. Benedetti,* 385 Pa. 163, 170, 122 A.2d 536,

539 (1956); *Jackson v. United States Pipe Line Co.,* 325 Pa. 436, 440, 191 A. 165, 166 (1937). . . .

"In Pennsylvania, experts have not been permitted to speak generally to the ultimate issue nor to give an opinion based on conflicting evidence without specifying which version they accept. These principles have been designed to permit the expert to enlighten the jury with his special skill and knowledge but leave the determination of the ultimate issue for the jury after it evaluates credibility." *Kozak v. Struth,* 515 Pa. 554, 558-59, 531 A.2d 420, 422 (1987).

There is no question that Tarris' conclusion that the western skid mark was caused by Husband was critical to his opinions. The jury was told this directly by Tarris. In doing so, Tarris testified as to the facts upon which his opinion was based—including evidence that he gathered from personally visiting the scene—as he is required to do under Pennsylvania law. See Pa.R.E. 705. Tarris was confronted by the contrary evidence on cross-examination and the jury heard his explanations. He openly acknowledged that his conclusion that both skid marks came from the Nunemachers' bike conflicted with the statements of the Nunemachers and Cruz. During our instructions to the jury, we explicitly highlighted the critical nature of this testimony and the need for the jury to resolve this material dispute of facts in determining what weight to give to Tarris' opinions. (N.T., vol. II, pp. 24-25.)

Contrary to the Nunemachers' tacit assumption, there is no legal priority in the weight to be given direct or circumstantial evidence. The conflicting evidence as to

the source of the skid marks was clearly an issue of fact and credibility for the jury. *Kozak, supra.*

### B. *Weight of the Evidence—Inadequacy in the Amount of the Verdict*[9]

A new trial based upon a weight of the evidence claim shall be granted to a party:

"only where the verdict is so contrary to the evidence as to shock one's sense of justice [and not] where the evidence is conflicting [or] where the trial judge would have reached a different conclusion on the same facts.

---

9. To the extent Sensinger argues this issue has been waived because no objection was made at the time the jury returned its verdict, Sensinger's legal premise is incorrect. Unlike a facially inconsistent verdict which requires the making of a timely, contemporaneous objection upon the rendering of the verdict to preserve the issue for post-trial relief and appellate review, *Straub v. Cherne Indus.*, 583 Pa. 608, 616 n.8, 880 A.2d 561, 567 n.8 (2005), a challenge based on the weight of the evidence need not be made before the jury is discharged and the verdict recorded in order to preserve the issue for review. *Criswell v. King*, 575 Pa. 34, 45, 834 A.2d 505, 506 (2003). While conceptually an inconsistent verdict is manifestly unreasonable and objectively discernible at the time of trial and, therefore, capable of being corrected before the jury is discharged, a claim challenging the weight of the evidence "is not premised upon trial court error or some discrete and correctable event at trial"; such a challenge does not allege any facial error in the verdict of the jury but instead is dependent on the court's independent review and evaluation of the verdict and its conclusion that "the verdict was so contrary to what it heard and observed that it will deem the jury's verdict such a miscarriage of justice as to trigger the court's time-honored and inherent power to take corrective action." *Id.* at 512. And, unlike an inconsistent verdict which the court can bring to the jury's attention and request be reconciled, "a trial judge cannot issue a corrective instruction to the jury suggesting that the weight of the evidence does not support its verdict without invading the province of the jury by essentially directing a verdict." *Id.*

.

164

"We have held that it is the duty of the trial court to control the amount of the verdict; it is in possession of all the facts as well as the atmosphere of the case, which will enable it to do more evenhanded justice between the parties than can an appellate court. Thus, a jury verdict is set aside for inadequacy when it appears to have been the product of passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff. Hence, a reversal on grounds of inadequacy of the verdict is appropriate only where the injustice of the verdict [stands] forth like a beacon." *Womack v. Crowley,* 877 A.2d 1279, 1283 (Pa. Super. 2005) (quoting *Davis v. Mullen,* 565 Pa. 386, 390, 773 A.2d 764, 766 (2001)).

A new trial is warranted on weight of the evidence grounds only "in truly extraordinary circumstances, *i.e.,* when the jury's verdict is 'so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" *Criswell v. King,* 575 Pa. 34, 834 A.2d 505, 512 (2003). (quotations and citations omitted) Because the power of a trial court to nullify a jury's verdict on the basis of evidentiary weight overrides the primacy of the jury in determining questions of credibility and evidentiary weight, the remedy of overturning the jury's verdict on this basis is extraordinary. To do so, "the judicial conscience [must] not merely [be] disappointed, or uncomfortable, but [must be] shocked." *Id.,* 834 A.2d at 513.

In this case, Wife testified that she injured her right wrist and elbow in the accident. The same day she was

taken to the emergency room of the Gnaden Huetten Memorial Hospital where a splint was placed on her wrist and she was released. Two days later her wrist was placed in a cast. For a "couple of weeks" she received physical therapy for strengthening, both her wrist and elbow improved, and the pain apparently subsided. (N.T., vol. I, pp. 70-71.)

No evidence was presented as to the size of her cast, when the cast was removed, or of any discomfort associated with the cast. No evidence was presented as to the number or frequency of physical therapy sessions she attended. No evidence was presented as to any activities Wife was unable to perform or was restricted in performing. Other than stating that on the day of the accident she felt a "gnawing, stabbing pain" and that the pain she experienced in her wrist and elbow was worse and more frequent than before the accident, no evidence was presented as to the severity or frequency of the pain, or of any pain medication prescribed for or taken by Wife. (N.T., vol. I, p. 70.)

In December 2001, according to Wife, the "gnawing, stabbing pain" in her right elbow returned, was "almost constant," and wouldn't go away. Wife first saw Dr. Talsania for this pain in January 2002. Tests performed by Dr. Talsania ruled out any fractures or nerve damage. On the basis of a differential diagnosis, Dr. Talsania determined that Wife's problem was tennis elbow—the triceps of her right arm snapping over the bony ridge of her elbow—and that the problem was attributable to the motorcycle accident. (Talsania deposition, pp. 39-40.) In rendering his opinion on the cause of Wife's problem, Dr. Talsania explicitly acknowledged that the validity of

this opinion was dependent on the truthfulness of Wife accurately reporting the onset of the snapping symptoms. (Talsania deposition, p. 40.)

Dr. Talsania performed surgery on Wife's elbow on April 15, 2002. Wife received rehabilitative therapy at home and reported that all problems with her right elbow had returned to their pre-accident condition by June or July of 2002. Dr. Talsania did not treat Wife for any injury to her right wrist nor was any expert medical testimony presented with respect to the nature of this alleged injury. In fact, Wife acknowledged that any additional problems she had with her right wrist after the accident had resolved before she met with Dr. Talsania. (N.T., vol. I, p. 77.)

In this case, Sensinger challenged the cause of Wife's injuries. As to the cause, in awarding Wife all of her claimed medical expenses for the surgery performed by Dr. Talsania, the jury necessarily found that the difficulty Wife experienced with her triceps was caused by the accident. However, it is not insignificant that Wife's initial complaint of pain appears from the evidence to have resolved itself within the two-week period Wife first received physical therapy and was followed by a one- to two-month period before Wife sought treatment from Dr. Talsania.

"[A] jury is entitled to reject any and all evidence up until the point at which the verdict is so disproportionate to the uncontested evidence as to defy common sense and logic." *Neison v. Hines,* 539 Pa. 516, 521, 653 A.2d 634, 637 (1995). In those circumstances where medical expenses have been awarded without an award of pain

and suffering, our courts have held that if the injuries sustained were "of the types that normally involve pain and suffering" the failure to compensate for pain and suffering results in a verdict which "bears no reasonable relation to the injuries suffered." *Burnhauser v. Bumberger,* 745 A.2d 1256, 1261 (Pa. Super. 2000); *Womack, supra* at 1284. Our Supreme Court has also stated that: "a jury's award of medical expenses without compensation for pain and suffering should not be disturbed where the trial court had a reasonable basis to believe that: (1) the jury did not believe the plaintiff suffered any pain and suffering, or (2) that a pre-existing condition or injury was the sole cause of the alleged pain and suffering." *Davis v. Mullen, supra,* 773 A.2d at 767.

In this case, Sensinger also challenged the extent and duration of Wife's injuries. While Wife complained of increased pain in her right wrist and elbow after the accident, she acknowledged her pre-existing work-related injury to her right arm; that she had received medical treatment for this injury, including surgeries in 1997 and 1998, and was still receiving follow-up medical treatment at the time of the accident; and that she had not returned to work since the injury and was unemployed when the accident occurred.

It is undisputed that Wife met with the treating physician for her pre-existing injury, Dr. Mauthe, on October 1, 2001, less than two weeks before the accident at issue. (Talsania deposition, p. 48.) At that time, Wife was taking medications and wearing a Dynasplint on her right elbow. (Talsania deposition, pp. 48-49.) Additionally, based on Wife's own testimony, at the time of the accident she continued to experience "numbness and tin-

gling" in the last three fingers of her right hand, had pain in her wrist, and felt some pain in her right elbow. (N.T., vol. I, p. 65.) When asked at trial whether the problems she was having with her elbow after the accident were the same or different than those she was having before the accident, Wife initially responded, "Basically." (N.T., vol. I, p. 74.)

Under these circumstances, we believe the jury could rationally determine that Wife did not suffer a serious debilitating injury. In *Davis,* the court stated that whether a defendant caused the plaintiff's injuries and whether the plaintiff suffered compensable pain are issues peculiarly within the province of the jury to determine. *Davis v. Mullen, supra,* 773 A.2d at 769. As to the jury's determination to award medical expenses only, "the existence of compensable pain is an issue of credibility and juries must believe that plaintiffs suffered pain before they compensate for that pain." *Id.*; cf. *McDermott v. Consol. Rail Corp.,* 567 Pa. 561, 789 A.2d 203 (2001) (per curiam) (finding that notwithstanding an injury to the nerves requiring two surgeries, an award for lost wages with no accompanying award for pain and suffering is not per se invalid).

Nor, in the absence of an obvious injury with which pain is naturally associated, is the jury, when faced with complaints of subjective pain, "obliged to believe that every injury causes pain or the pain alleged." *Boggavarapu v. Ponist,* 518 Pa. 162, 167, 542 A.2d 516, 518 (1988). Further, in *Majczyk v. Oesch,* 789 A.2d 717, 726 (Pa. Super. 2001) (en banc), the court noted that for some injuries, the jury may appropriately conclude that the plaintiff's "discomfort was the sort of transient rub

of life for which compensation is not warranted." See also, *Andrews v. Jackson,* 800 A.2d 959, 965 (Pa. Super. 2002), *appeal denied,* 572 Pa. 694, 813 A.2d 835 (2002) (a jury may find negligence and causation based on the uncontradicted testimony of both parties' medical experts but then "deny damages on the basis that the injury was not serious enough to warrant compensation"); *Kennedy v. Sell,* 816 A.2d 1153 (Pa. Super. 2003).

In this case, the jury may have believed that Wife's subjective complaints of pain were not credible because the part of her body injured in the accident was the same part for which she was receiving treatment and experiencing pain immediately before the accident. In other words, the jury may have believed Wife suffered no additional pain for any injuries sustained in the accident above and beyond those problems which pre-existed and were unrelated to the accident. The jury may also have found that any pain caused by injuries Wife sustained in the accident was not only transient, but incrementally minor and virtually indistinguishable from the pain and discomfort attributable to her pre-existing injury and, therefore, noncompensable.

Clearly, we cannot presume to know what happened in the jury room or what was the basis of the jury's reasoning. We are constrained, however, by what are reasonable possibilities explaining the jury's verdict and whether the jury properly exercised its prerogative to believe all, some, or none of the evidence.

Ultimately, the determination of "what is a compensable injury is uniquely within the purview of the jury." *Majczyk,* 789 A.2d at 726. With the foregoing in mind, the jury's decision not to award damages for pain and

suffering is not inconsistent with its award of medical expenses only and does not offend our sense of overall justice in this case.[10]

10. Husband's argument that he was somehow prejudiced when the error in Wife's verdict slip was detected and the jury was directed to resume its deliberations is speculative and finds no support in the record.

Both Husband's and Wife's verdict slips were reviewed and approved by counsel prior to being distributed to the jury. (N.T., vol. I, pp. 239-42.) At the conclusion of the court's closing instructions and before the jury began its deliberations, counsel were provided with an opportunity to voice any objections they might have to the verdict slip or the court's closing instructions: none did so. (N.T., vol. II, p. 68.) Only after the jury announced its verdict as to the Nunemachers' claims against Sensinger, did it become apparent that the jury had not rendered a verdict with respect to the claims of the Wife against Husband raised in the joinder complaint.

In instructing the jury further on these issues and directing the jury to resume its deliberations, the court did not suggest one way or another how the jury should decide the issue of Husband's liability to Wife or what amount of damages to find. (N.T., vol. II, pp. 76-78.) What the jury had already decided, that Sensinger did not act negligently, was an issue separate and distinct from whether the Husband was negligent and whether such negligence, if any, caused damages to the Wife.

In directing the jury to answer these remaining questions, the court did not introduce any issues into the case which counsel had not expected the jury to decide. Instead, the court properly and appropriately corrected an error on the face of the Wife's verdict slip, which incorrectly instructed the jury not to decide the issues of Husband's liability to Wife in the event it found Sensinger was non-negligent, and explained that these issues still needed to be decided.

While we believe counsel's initial failure to timely object to the wording on Wife's verdict slip constituted a waiver of the issue, at the time we first became aware of the error the jury was still present and had not been discharged, and the error was then capable of being corrected without prejudice to any party. Counsel has not argued that our subsequent instructions to the jury were in themselves erroneous or prejudicial, but that our decision to correct an error which was capable

## III. CONCLUSION

In accordance with the foregoing, the Nunemachers' motion for post-trial relief will be denied in total and judgment entered on the jury's verdict.

---

of being corrected was itself error. Cf. *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974) (noting the policy considerations underlying the contemporaneous objection rule: that timely and specific objections advance judicial economy by allowing a trial court to immediately address errors which are subject to correction before the trial ends). Having failed to establish any basis for prejudice on this issue, Husband's motion for a new trial will be denied. See *Berger v. Schetman,* 883 A.2d 631, 636 (Pa. Super. 2005) (stating that the occurrence during trial of some irregularity does not in and of itself warrant the grant of a new trial in the absence of demonstrated prejudice resulting from the mistake).